## JUDGE COLLINS *v.* STATE.

[56 South. 527.]

1. CRIMINAL LAW. *Trial. Argument of counsel. Duty of court.*

   In the trial of a negro for the murder of another negro it was error for the prosecuting attorney in his argument to the jury to say "this bad nigger killed a good nigger. The dead nigger was a white man's nigger, and these bad niggers like to kill that kind. The only way you can break up this pistol toting among these niggers is to have a necktie party."

2. SAME.

   In such a case where defendant's attorney had stated in his argument that one of the witnesses for the state had assisted in hiring a special prosecutor and was taking an interest in the case, such a remark did not justify the court in permitting the prosecuting attorney to say, "I will tell you who employed me to prosecute this nigger. It was the people of the community, white and black," as such a statement tended to show that public sentiment was against the accused.

3. SAME.

   It was the duty of the trial judge of his own motion to have instructed the jury that such remarks were improper and that they in their deliberations should not be governed by any such statements made by the prosecuting officer.

APPEAL from the circuit court of Sharkey county.
HON. H. C. MOUNGER, Judge.

Judge Collins was convicted of murder and appeals.

The facts are sufficiently stated in the opinion of the court.

*W. E. Mollison,* for appellant.

The assistant prosecuting attorney, in his opening argument against the appellant used this language to which proper exceptions was made: "This bad nigger killed a good nigger; the dead nigger was a white man's nigger, and these bad niggers like to kill these kind; the only way you can break up this pistol toting among these niggers is to have a neck-tie party."

In making the closing argument for the state, the other attorney employed for the prosecution, used this language: "Gentlemen of the jury, I will tell you who employed me to prosecute this nigger. It was the people of the community, white and black," to which the attorney for the appellant excepted in due form, and the court, as we believe very erroneously, refused to exclude the consideration of these remarks from the jury. This court has frequently condemned the words complained of, if not in terms, certainly in spirit. In numerous cases it has declared that it will not permit convictions to stand even of lower grades of felonies than murder, wherein it appears that race prejudice may have entered into the wavering balance in which truth is to be weighed." In this case it takes no surmise nor guess work to see that the deadly seed planted in the opening argument nurtured in closing, bore their wicked fruit in a verdict which the evidence did not justify. This court with its vast experience understands full well what is meant by the term "white man's nigger." It has two meanings, one which endears the possessor of the name to the average white man who looks upon this class as willing and obedient servants, ready to execute any commission a white man may set, whether lawful or not, and to the better white man, it often carries with it an idea

that a white man's nigger is loyal, peaceful and faithful
to the last degree to white ideals and white control. The
average white jury would take it for granted that the
killing of a white man's nigger is a more serious crime
than the killing of a plain, every-day black man. To say
that "this class of nigger makes it a point to kill the .
white man's nigger" would in itself be sufficient to ren-
·der this verdict an outlaw in the jurisprudence of Miss-
issippi, but when it is coupled with the remark, "the
only way to break up this pistol toting among niggers
is to have a neck-tie party," is sufficient to make even
the state's own counsel ashamed to attempt to uphold the
evil fruit of these seed planted in passion and nurtured
by prejudice.

In every case before this court in which the question
has been presented, it has been distinctly held that if
timely objection be taken to improper remarks of the
prosecuting attorney and the facts are not over-whelm-
ingly conclusive of the defendant's guilt, this court will
reverse. In the case at bar a jury has found a verdict
consigning a human being to the gallows on testimony
which at the very worst would barely justify a verdict of
manslaughter. So manifestly shocking to the conscience
of lawyer and layman is this pronouncement, that if the
remarks complained of were not in the record, men read-
ing it could never conceive how such·a result could pos-
sibly have been arrived at. In reversing a conviction
wherein a reference was made to the courthouse in which
a conflict of the races had taken place, the supreme court
of Louisiana, 53 So. Rep. 959, said:

"We trust prosecuting officers will take warning and
understand that on the trial of negroes before white
juries the relation of the two races is dangerous ground
to tread on their closing addresses."

The supreme court of Louisiana in reversing the case
of the *State* v. *Bessa,* 38 So. Rep. 985, made this signifi-
cant remark which is on all fours with the facts in this
case:

"The court thinks it knows enough of the situation between the whites and negroes in Louisiana to know that the average white man is prone enough to be prejudiced in such a case without being exhorted thereto by the law officer of the government, and that such an appeal having been once made, the effect thereof cannot be counteracted by any mere cautionary or sober reason that may be uttered by the judge."

Judge Calhoun, for this court, delivered an opinion in the case of *Hampton* v. *State,* 40 So. Rep. 545, which has become the pillar of fire by night and cloud by day to all who seek to administer justice with "unfevered hand." This case has been quoted wherever the English language is spoken and the white man administers justice to alien or inferior races.

"Mulattoes, negroes, Malays, whites, millionaires, paupers, princes, and kings, in the courts of Mississippi are on precisely the same exactly equal footing. All must be tried on facts, and not on abuse. Only impartial trials can pass the Red Sea of this court without drowning. Trials are to vindicate innocence or ascertain guilt and are not to be vehicles for denunciation." This reads like Holy Writ. It is an ever present guide in this case.

*Jas. R. McDowell,* assistant attorney-general, for appellee.

The defendant relies solely for reversal upon certain remarks of the prosecuting attorney, as set out in the special bill of exceptions, on page 36. The court will note that the remarks of counsel who opened the case were not objected to by the defendant. This precludes any objection now. *Regan* v. *State,* 87 Miss. 422; *Richburger* v. *State,* 90 Miss. 806.

While it is true the remarks might have been omitted, still under the facts of the case where one negro is charged with killing another, I do not think it could have any weight whatever. The jury could not have returned

any other verdict than that of guilty. If they believed the state's witness was telling the truth, and even taking defendant's own testimony, he convicts himself. He admits he was the aggressor and seeks to escape the penalty of his act by testifying that after he had provoked the difficulty and that while he was armed and his opponent not armed, that he killed his opponent because he was attempting to take his pistol away from him. What sort of defense is this? Absolutely none. Out of his own mouth he convicts himself of murder. It is impossible to conceive that the jury would have been prejudiced against him because of these remarks of the district attorney, which went to the jury without objection.

The other remarks attributed to counsel were objected to, but the court overruled the objection and stated the reason therefor, which is that the predicate for such remarks had been laid by defendant's counsel in his speech. Besides, this could have had no effect on the jury. It makes no difference who is paying associate counsel to prosecute. The fact that a subscription was taken up among the people of the community, both white and black, could not have harmed the case in the eyes of the jury. Every case of this sort must stand on its own bottom. The remarks of prosecuting attorneys in every case must be considered in the light of the facts as developed in the trial. If, undoubtedly, these remarks could not have prejudiced the defendant's case. no reversal should be granted.

McLEAN, J., delivered the opinion of the court.

The appellant was convicted of murder, and the death penalty imposed. He is not at all satisfied with the result in the court below, and hence his appeal.

The case on the facts is an extremely close one; but, as the case must be tried anew, we abstain from any discussion of the facts, except to say that the difficulty was a sudden one, and that probably Rube Boyd, the appel-

lant's antagonist, would not have been killed, had he, Boyd, not picked up, or attempted to pick up, immediately before the killing, what the state's witness denominates as "a big peach tree stick."

However, we reverse the case upon the sole ground of what we conceive to be improper and damaging references made by the assistant district attorney in his argument to the jury, which were as follows: "This bad nigger killed a good nigger. The dead nigger was a white man's nigger, and these bad niggers like to kill that kind. The only way you can break up this pistol toting among these niggers is to have a necktie party." Those who are at all familiar with the favor, indeed, we may say affection, that the white man entertains for a "white man's nigger," can well and justly appreciate the effect that such an unwarrantable statement, made by an officer of the law, will have before the ordinary jury of the land. The appellant may be a bad negro, and a very undesirable member of society, yet he is entitled to go before the jury of the land untrammeled by voluntary epithets, the occasion for which is not shown justified by this record.

One of the attorneys for the state, in making the closing argument, made use of the following language: "I will tell you who employed me to prosecute this nigger. It was the people of the community, white and black." The defendant then and there objected to this line of argument as tending to prejudice the defendant's interest, and the court overruled the objection, and the remarks of the prosecuting counsel were repeated, to all of which the defendant then and there excepted. The bill of exceptions shows that "the court declined to exclude the above last mentioned language, for the reason that counsel for the defendant in his speech had stated that Abe Robinson, one of the witnesses for the state, had assisted in employing an attorney to assist in the prosecution, and that there were a hundred reasons for

his taking an interest in the prosecution." It may be that the remark made by the counsel for the defendant was improper, yet this did not justify the court in permitting the state's counsel in making the line of argument that was made. Two wrongs never make a right. The ordinary, average juror is very easily influenced by a statement to the effect that the people of the community, both white and black, employ one to prosecute. The very fact that this is done is the highest evidence that the community desires the party convicted. There is nothing so potential in influencing men as public sentiment. Very few people have the courage and backbone either to oppose or to resist public sentiment. It is a trite saying that the voice of the people is the voice of God—"*vox populi, vox Dei.*" Can any one say, under such circumstances, the defendant has had that which the Constitution guarantees to every man—a fair and impartial trial? The appellant is a negro, yet he is entitled to be tried by the same rules of law, and he must receive, while upon a trial for his life, the same treatment, as other persons. Common justice and common honesty cry aloud against the treatment shown by this record. While no objection was made at the time by the defendant to the first statement made, yet a special bill of exceptions was taken during the progress of the trial, and this matter specially called to the attention of the trial judge and made a ground for a new trial, and is assigned as error.

It was the duty of the trial judge *sua sponte* to instruct the jury that such remarks were improper, and that they in their deliberations should not be governed by any such statements made by the prosecuting officer, *Martin* v. *State*, 63 Miss. 505, 56 Am. Rep. 813; *Perkins* v. *Guy*, 55 Miss. 153, 30 Am. Rep. 510; *Cavanah* v. *State*, 56 Miss. 299; *Hampton* v. *State*, 88 Miss. 257, 40 South. 545, 117 Am. St. Rep. 740. The simple fact that the trial judge, occupying, as he does a position of great

power and influence, fails to interpose when a damaging statement is made in his presence, and before and to the twelve men who are trying the cause, is *sub silentio* an indorsement of the statement—at least, a seeming one. Violators of the criminal laws should be vigorously prosecuted, but there is a vast difference between legitimate prosecution and appealing to race prejudice and to the popular clamor.

*Reversed, and a new trial awarded.*

Smith, J., dissents.